Exhibit F

# *Henderson*

### *v.*

# *General Revenue Corporation, et al.*

30(b)(6)

## **Mark Verbrugge**

July 19, 2019

### *Henderson v. General Revenue Corporation, et al.*



# SMITH REPORTING

## INDIANA COURT REPORTERS

400 North High Street, Suite 200, Muncie, Indiana 47305

800.700.3566   -   765.284.7836

## www.smithreporting.net

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

8

1    analyst at the USA Group?

2  A.    1995.

3  Q.    All right.  What's your educational

4    background?

5  A.    I have a BS in business administration from

6    Indiana University at Kokomo.

7  Q.    And when did you get that degree?

8  A.    '87, 1987.

9  Q.    Do you work at that building that I saw up

10    the highway, Navient?  It's a large building.

11  A.    Right off of 116th and 69.  If you saw that

12    one, yes.

13  Q.    All right.  What did you do to prepare for

14    today's deposition?

15  A.    I met with the counsel and my

16    internal-external counsel.

17  Q.    Did you review any documents?

18  A.    We reviewed documents associated with the

19    case, yes.

20  Q.    And have you been designated to answer all

21    the questions in our 30(b)(6) deposition

22    today?

23  A.    Yes.

24        (Whereupon Exhibit A is marked for

25    identification.)

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

9

1  FURTHER QUESTIONS BY MR. FISHWICK:

2  Q.    I'll show you what's about to be marked by

3        the court reporter as Exhibit A and ask you,

4        have you seen that document before?

5  A.    I have.

6  Q.    Do you know when you first saw it?

7  A.    Yesterday.

8  Q.    That was the first time you'd seen it?

9  A.    Yeah.  I believe that's the first time I saw

10       it, yes.

11 Q.    All right.  And was the first time that you

12       started looking for documents to answer these

13       questions yesterday?

14       MS. SIMONETTI:  This witness wasn't

15       involved in gathering documents.  That was

16       handled through in-house counsel.

17 A.    Can you rephrase the question?

18       MR. FISHWICK:  Could you play that

19       question back.

20       THE COURT REPORTER:  "And was the first

21       time that you started looking for documents

22       to answer these questions yesterday?"

23       MS. SIMONETTI:  The witness wasn't

24       involved in gathering documents for the case.

25       It was sent to in-house counsel.

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

10

1   FURTHER QUESTIONS BY MR. FISHWICK:

2   Q.    You can go ahead and answer the question.

3   A.    I did not gather documents.

4   Q.    Was the first time that you looked at

5         documents yesterday?

6   A.    Yes.

7   Q.    So your -- was your entire preparation for

8         today's deposition done yesterday?

9   A.    Yes.

10  Q.    I draw your attention to Question 1 of the

11        30(b)(6) notice.  So we're just going to go

12        through this in chronological order today.

13        So we'll start at No. 1.  What's your answer

14        to the question?

15            MS. SIMONETTI:  What's the question?

16        That is completely improper, and it's

17        actually absurd.  So what's the question,

18        John?

19  FURTHER QUESTIONS BY MR. FISHWICK:

20  Q.    Go ahead.  You can answer.

21  A.    I don't know what the question is.

22  Q.    Okay.  Do you have any -- have you studied

23        No. 1, and do you have a response to the

24        administration, organizational, and

25        management structure of NPM from June 22 to

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

15

1   A.   To the best of my knowledge, I believe he's

2        part of Navient Solutions, LLC.

3   Q.   That's who he works for?

4   A.   To the best of my knowledge, yes.

5   Q.   That's his employer?

6        MS. SIMONETTI:  This is irrelevant.

7        Go ahead and answer the question again.

8   A.   Yeah.  To the best of my knowledge, that's

9        who he works for.

10       MR. FISHWICK:  I don't think you can be

11       in here.  You're not a party to this case.

12       MR. SHELDON:  I represent them.

13       MS. SIMONETTI:  Yeah, he can.  He's

14       in-house counsel representing NPM.

15       MR. FISHWICK:  He says, though, you work

16       for Navient Solutions.

17       MR. SHELDON:  That's who I'm employed by,

18       but I represent this entity.

19       MR. FISHWICK:  You're their corporate

20       counsel?

21       MR. SHELDON:  Yes.

22       MS. SIMONETTI:  Uh-huh.

23       MR. FISHWICK:  How can you be their

24       in-house corporate counsel if you don't work

25       for them?

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

27

1        Portfolio Management.

2  Q.   Are there any policies on which ones are

3        forwarded to Navient Portfolio Management?

4  A.   If there is an actionable item required to be

5        taken on an account that requires involvement

6        of NPM, that would be required to be

7        forwarded to Navient Portfolio Management.

8  Q.   And is there documentation of that

9        requirement?

10  A.   I don't think there's a specific policy that

11        says, "actionable events." We have training

12        manuals for all our vendors that discuss what

13        needs to be sent and what doesn't need to be

14        sent.

15  Q.   And does NPM prepare those training manuals?

16  A.   NPM does produce training manuals or training

17        documentation, yes.

18  Q.   And so would those training manuals have

19        had -- they have in there that if it's an

20        actionable item, that it should be forwarded

21        to NPM?

22  A.   Yes.

23  Q.   And were there training manuals in place for

24        Mr. Henderson's account?

25  A.   Yes.

28

```
 1   Q.   And it would have been -- and there would
 2        have been -- those manuals would have given
 3        instruction to people about how to handle his
 4        account?
 5             MS. SIMONETTI:  That's ambiguous.
 6             Go ahead.
 7   A.   That's not what I'm saying, no.  There are
 8        training documents that inform agencies to
 9        forward requests.  For example, if a borrower
10        requests of General Revenue that they require
11        a statement of account, that request would
12        come to -- from General Revenue or any agency
13        to Navient Portfolio Management to provide
14        statement of account on behalf of the
15        borrower.
16   Q.   And so the General Revenue employee would
17        know from the training manual that they were
18        supposed to forward that document to NPM?
19   A.   There's no other way to fulfill the request.
20        GRC cannot produce the statement of accounts
21        off their system.
22   Q.   So, but just in answer to my question, the
23        GRC employee would know from the training
24        manual that they're supposed to forward it to
25        NPM?
```

29

1   A.     Yes.

2   Q.     And did that happen in this case with

3          Mr. Henderson's case?

4   A.     Yes.

5   Q.     So, but -- and so when the GRC employee

6          forwarded it to NPM, they were doing that

7          because of the training they'd received

8          pursuant to this training manual?

9   A.     I can't answer your question like that, no.

10  Q.     All right.  Why not?

11  A.     I have no idea what the person that received

12         the request for statement of account's

13         intentions were.  In order to fill

14         Mr. Henderson's request for an SOA, the only

15         way to fulfill the request would be to

16         forward it to Navient Portfolio Management.

17  Q.     But did that GRC employee -- how's the

18         training take place?  Do they -- is it a

19         PowerPoint?  Is it a document they have to

20         read?  How does that take place?

21  A.     We have a documented training manual that

22         outlines where to send those types of

23         requests.

24  Q.     And how does the -- for example, in this

25         case, how does the GRC employee receive that

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

30

| | | |
|---|---|---|
| 1 | | training? |
| 2 | A. | We provide the agency the training manual.  I |
| 3 | | don't know -- I can't speak to their training |
| 4 | | processes. |
| 5 | Q. | So you give, in this case, GRC a training |
| 6 | | manual for them to teach their employees? |
| 7 | A. | Specific to the touch points between their |
| 8 | | agency and Navient Portfolio Management, yes. |
| 9 | Q. | And do you require documentation that the |
| 10 | | employees, in this case, of GRC have received |
| 11 | | the training? |
| 12 | A. | No. |
| 13 | Q. | How big is the manual? |
| 14 | A. | That's hard to answer for this reason.  We |
| 15 | | have many clients, all with different |
| 16 | | requirements.  Specific to the FFELP student |
| 17 | | loans, Mr. Henderson, it's probably only |
| 18 | | about 10 pages long. |
| 19 | Q. | All right.  Are there any other training |
| 20 | | manuals that would be relevant to |
| 21 | | Mr. Henderson's case? |
| 22 | A. | No. |
| 23 | | MR. FISHWICK:  Lisa, have you produced |
| 24 | | that training manual? |
| 25 | | MS. SIMONETTI:  No.  I see no relevance |

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

31

```
 1        to it whatsoever.

 2             (Whereupon Exhibit No. 2 is marked for

 3        identification.)

 4  FURTHER QUESTIONS BY MR. FISHWICK:

 5  Q.    I'll show you what's been marked as Exhibit 2

 6        and ask you to identify what that document

 7        is.

 8  A.    It appears to be a letter written by

 9        Mr. Henderson and submitted to General

10        Revenue.

11  Q.    Have you seen it before?

12  A.    I can't say that I've seen this specific

13        letter, no.

14  Q.    Would NPM have received notice of this

15        letter?

16  A.    I don't know.

17  Q.    Have you checked to see if NPM did receive

18        notice of this letter?

19  A.    I have not.

20  Q.    Are there any policies, procedures, or

21        training manuals of NPM that would cover this

22        letter?

23             MS. SIMONETTI:  That's vague.

24             Do you understand the question?

25             THE WITNESS:  I do not.
```

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

34

1   A.    Correct.

2          (Whereupon Exhibit No. 3 is marked for

3          identification.)

4   FURTHER QUESTIONS BY MR. FISHWICK:

5   Q.    I show you what's been marked as Exhibit 3.

6          Have you seen this document before?

7   A.    I did see this document.

8   Q.    And did you see it yesterday?

9   A.    That is correct.

10  Q.    And what is this document?

11  A.    Again, written correspondence from

12         Mr. Henderson to General Revenue Corporation.

13  Q.    And would NPM have received notice of this?

14         Or did NPM receive notice of this?

15  A.    I don't know.

16  Q.    As part of your preparation for today's

17         deposition, did you research as to whether

18         NPM received notice of Exhibit 3?

19  A.    I have not.

20  Q.    Are there any policies, procedures, or

21         training manuals that would affect whether

22         NPM received notice of Exhibit 3?

23  A.    Yes.

24  Q.    And what are those?

25  A.    The same as we've discussed.

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

35

1   Q.   The training manual?

2   A.   Correct.

3   Q.   If this -- if Exhibit 3 had been forwarded to

4        NPM, which team would have handled that?

5   A.   This team it would have gone to, I call it

6        our customer care center.  We refer to inside

7        as Post-Claims Assistance.

8   Q.   Okay.  I think we discussed that.

9   A.   That's what I call -- like what I'll call my

10       customer care team.

11  Q.   And what is the customer care team?

12  A.   Led by Jim Trout.  It was discussed earlier

13       when we went through the individual teams

14       within Navient Portfolio Management.  The

15       customer care team receives borrower

16       correspondence, fulfills requests for

17       borrower correspondence.  They're an inbound

18       call center specific to for any borrower that

19       has questions on their account, they can call

20       Post-Claims Assistance to obtain answers on

21       their outstanding questions.

22  Q.   Did Mr. Henderson ever call in to the

23       customer care?

24  A.   Not that I'm aware of.

25  Q.   Did you investigate whether he had?

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

36

1    A.    I have not.

2    Q.    Did you speak to anybody at the customer care

3          team before to prepare for today's

4          deposition?

5    A.    No.

6    Q.    If someone calls in to the -- if

7          Mr. Henderson had called in to the customer

8          care, would there be a recording of that?

9    A.    Should be a record of the call, correct.

10   Q.    Has anybody at NPM done a search to see if

11         there are any calls?

12   A.    Not that I'm aware of.

13            MS. SIMONETTI:   In-house counsel looked

14         for call recordings.   There weren't any,

15         John.

16   FURTHER QUESTIONS BY MR. FISHWICK:

17   Q.    And how did in-house counsel search for

18         Mr. Henderson's calls?

19   A.    I can't speak to how they searched for their

20         calls.

21   Q.    Did he consult with you when he did it?

22   A.    Did he --

23   Q.    Did in-house counsel consult with you when he

24         did the search?

25   A.    If memory's correct, in-house counsel sent a

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

37

```
 1        request for documentation on the account.  I
 2        can't speak to if that was part of it.
 3   Q.   Do you know when that was sent?
 4   A.   No.
 5   Q.   And would this have been Mr. Sheldon?
 6   A.   I can't recall who sent the request.
 7   Q.   Are there other in-house counsel?
 8   A.   There -- there are other in-house counsel,
 9        yes.
10   Q.   And do they work for Navient Solutions as
11        well?
12   A.   I can't speak to that.  I don't know.
13   Q.   Well, your counsel said that in-house counsel
14        searched for any recordings from
15        Mr. Henderson.  What's your knowledge of
16        that?
17   A.   I didn't -- I didn't -- I can't answer that
18        question.
19   Q.   All right.  So you didn't do any independent
20        investigation to prepare for today to answer
21        that question?
22   A.   No.
23   Q.   Okay.
24            (Whereupon Exhibit No. 4 is marked for
25        identification.)
```

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

58

1   FURTHER QUESTIONS BY MR. FISHWICK:

2   Q.    The 30(b)(6) notice.

3   A.    Repeat, please.

4   Q.    Turn to the top of page 3.  Have you done an

5         investigation into phone calls made by

6         GRC/Pioneer following the February 28, 2017,

7         as part of their collection efforts of the

8         alleged Henderson debt?

9   A.    I have not.

10  Q.    For No. 4 on the notice, have you done an

11        investigation between communications between

12        NPM, USAF, GRC, Navient, and Pioneer

13        regarding Mr. Henderson's alleged debt?

14  A.    No.

15  Q.    Have you done any investigation under No. 4

16        concerning how the principal, interest, and

17        fees were calculated?

18  A.    No.

19  Q.    Have you done any investigation into any

20        calculation methods or explanation of

21        calculations?

22  A.    No.

23  Q.    Turning to No. 5.  Who was Zenith Bank?

24  A.    I have no idea.

25  Q.    Have you done any investigation in

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

59

```
 1            preparation for today to determine that?
 2   A.    No.
 3   Q.    Have you done any investigation between the
 4            relationship between NPM and Zenith Bank?
 5   A.    No.
 6            MS. SIMONETTI:  Calls for speculation.
 7            Also lacks foundation.
 8   FURTHER QUESTIONS BY MR. FISHWICK:
 9   Q.    Have you done any investigation into the
10            relationship between NPM and Zenith Bank as
11            relates to the servicing and/or collection of
12            Henderson's alleged loan or debt?
13            MS. SIMONETTI:  Lacks foundation.
14   A.    No.
15   Q.    Turning to No. 6.  Where are the documents as
16            relates to Mr. Henderson stored?
17   A.    Clarify the question.
18   Q.    Have you done any investigation as to where
19            the documents as relates to Mr. Henderson's
20            alleged student loan debt are stored?
21   A.    No, I haven't done any investigation as to
22            where the documents specific to
23            Mr. Henderson's case are stored.
24   Q.    Do you have any general knowledge about where
25            they would be stored?
```

60

1   A.    There is an imaging system that documents,

2         upon receipt, are stored in.

3   Q.    And what is that called?

4   A.    ECS.

5   Q.    And what is ECS?  How does it work?

6   A.    I have no idea how the imaging system works

7         other than documents are scanned and stored

8         within the ECS system.

9   Q.    All right.

10  A.    And categorized with account information so

11        we can pull specific to borrowers.

12  Q.    Are there -- is there a -- in the ECS system,

13        is there a file for Mr. Henderson?

14  A.    I have not investigated if there is a file

15        for Mr. Henderson in ECS.

16  Q.    And do you know how, if there is a file,

17        like, would it be by account number that you

18        can search it?

19  A.    You can search by account number.

20  Q.    Can you search by name?

21  A.    I'm not aware in the ECS system if you can

22        search by name.

23  Q.    All right.  And so who has access to the ECS

24        system?

25  A.    NPM employees.

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

64

1  A.    Correct.

2  Q.    Would there be any hard copy anywhere?

3  A.    With -- within Navient Portfolio Management?

4  Q.    Or from anybody.

5  A.    I can't speak for anybody.

6  Q.    Does -- how about within NPM?

7  A.    It would be in the ECS system.

8  Q.    Period?

9  A.    Correct.

10 Q.    Turning to No. 8, Question No. 8.  Are you

11       aware of any calculations performed by NPM as

12       to alleged amounts of principal, interest, or

13       fees owed by Henderson in which NPM, GRC, and

14       Pioneer have attempted to collect?

15 A.    I apologize, but I'm going to have you read

16       that back.

17 Q.    Are you aware of any calculations performed

18       by NPM as to alleged amounts of principal,

19       interest, or fees owed by Henderson in which

20       NPM, GRC, and Pioneer have attempted to

21       collect?

22 A.    I am not.

23 Q.    Did you do any investigation into that prior

24       to today's deposition?

25 A.    No.

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

65

1   Q.    How long did you meet with counsel yesterday?

2   A.    Two hours.

3   Q.    And was that the extent of your entire

4         preparation for today, that two-hour meeting?

5   A.    Correct.

6   Q.    And was your meeting with counsel with both

7         Ms. Salmonetti and Mr. Sheldon?

8              MS. SIMONETTI:   Simonetti.

9   FURTHER QUESTIONS BY MR. FISHWICK:

10  Q.    Simonetti.

11  A.    Yes.

12             (Whereupon Exhibit No. 7 is marked for

13        identification.)

14  FURTHER QUESTIONS BY MR. FISHWICK:

15  Q.    I'll show you what's been marked as Exhibit

16        7.  I'll show you what's been marked as

17        Exhibit 7 and ask you if you've seen that

18        before.

19  A.    Yeah.  I saw it earlier today.  I think it's

20        this same letter.

21  Q.    But other than in the deposition, you hadn't

22        seen it before today?

23  A.    I reviewed documents yesterday that I'm not

24        sure if I saw the one dated February 28.  I

25        think I stated that earlier.  So I don't

66

1      believe so.  I don't recall seeing this

2      specific letter.

3 Q.   Now, would this be what you testified to

4      earlier, that the training manual would cover

5      the NPM response to this?

6 A.   The NPM training document would inform the

7      agency upon such a request to send it to

8      Navient Portfolio Management to fulfill.

9 Q.   And what does the training say about, like,

10      how promptly that should happen?

11 A.   I don't believe the training manual speaks to

12      the promptness.

13 Q.   Okay.  Again, you don't know when NPM got

14      this?

15 A.   No.

16 Q.   And does NPM actually get the letter?  Does

17      the policy provide that it gets the actual

18      letter from the person who owes the money?

19 A.   I don't know if the policy states that we

20      need to obtain the actual letter.

21 Q.   All right.  Do you know if you got this

22      actual letter in the NPM system?

23 A.   I do not.

24 Q.   Are there -- other than the training manual,

25      are there any other policies or procedures of

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

68

1   FURTHER QUESTIONS BY MR. FISHWICK:

2   Q.    I show you what's been marked as Exhibit 8.

3         Is this the one that you think you've seen

4         before?

5   A.    I know I saw it earlier today, again, so.

6   Q.    And the same answer?  The training manual

7         would have covered it for the agency as to

8         for them to notify NPM that they needed to --

9         that they needed to respond to this?

10  A.    Correct.

11  Q.    And the response was the -- we've seen

12        earlier in the deposition, that's what was

13        triggered as the response?

14  A.    I -- can you --

15  Q.    Let me just get the exhibit number.

16            And I show you what was previously marked

17        as Exhibit 4.  Would that have been the

18        response?

19  A.    Had NPM received a request to produce a

20        statement of account, that would have been

21        the response, correct.  And I assume that

22        that is the response based upon the

23        production of said document.

24  Q.    But you haven't gone to check to see if they

25        did receive this request within the software?

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

69

1   A.   Correct.  I have not.

2   Q.   Okay.  Turn to No. 10.  What is the process

3        in place when a borrower or debtor asks for a

4        verification?

5             MS. SIMONETTI:  Can you read that back.

6             Is that question directed to NPM or --

7             MR. FISHWICK:  Yes.  It's No. 10.

8             MS. SIMONETTI:  Are you asking about

9        NPM's process?

10            Can you read that back.

11            THE COURT REPORTER:  "What is the process

12       in place when a borrower or debtor asks for a

13       verification?"

14            MS. SIMONETTI:  I think that's vague.

15            But go ahead.

16  A.   A borrower requesting validation of debt

17       will -- the SOA will be produced and sent.

18  Q.   And that's -- and so that comes in through

19       Eagle, and then the notation is made by an

20       NPM employee when the -- when it issues its

21       statement?

22  A.   The question you ask is confusing.  The

23       agencies, when they receive a request for

24       debt validation, they send a request for an

25       SOA to Navient Portfolio Management.  Navient

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

70

```
 1              Portfolio Management fulfills the request of
 2         the SOA.
 3    Q.   And the data for that SOA comes from Eagle?
 4    A.   That is correct.
 5    Q.   It's generated by the Eagle software program?
 6    A.   It's generated -- yes.
 7              (Whereupon Exhibit No. 9 is marked for
 8         identification.)
 9    FURTHER QUESTIONS BY MR. FISHWICK:
10    Q.   I show you what's been marked as Exhibit 9.
11         Have you seen this document before?
12    A.   I have.
13    Q.   And what is that document?
14    A.   It's an agreement for collection services of
15         defaulted student loans owned by United
16         Student Aid Funds between Navient Portfolio
17         Management, LLC and Pioneer Credit Recovery,
18         Inc.
19    Q.   In the second paragraph on the first page of
20         that agreement, it says that Navient, the
21         first line there, "desires to utilize
22         contractor debt collection services."  What
23         are those?
24    A.   I don't know how other to say it other than,
25         you know, we contract with collection
```

72

```
 1          The document we talked about earlier, and it
 2          also talks about a Compliance/Portfolio
 3          Management Audit Guide, which is really one
 4          document in and of itself.
 5   Q.     So what is the Navient Portfolio Management
 6          Compliance Guide?
 7   A.     It's a document that ensures -- well, informs
 8          agencies -- informs agencies how -- it's
 9          really just a document to ensure agencies are
10          maintaining compliance with state and federal
11          regulations.
12   Q.     All right.
13             MR. FISHWICK:  And has that been produced
14          in this case?
15             MS. SIMONETTI:  I don't believe so.  It's
16          not a document that belongs to NPM, the
17          company NPM, so I don't believe so.
18   FURTHER QUESTIONS BY MR. FISHWICK:
19   Q.     Who does that document belong to?  It's
20          called the Navient Portfolio Management
21          Compliance Guide.
22   A.     The compliance guide is owned by a compliance
23          arm of Navient Solutions, LLC.
24   Q.     And who is that?  Is it Navient Solutions
25          that owns this or is it --
```

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

73

1   A.    They are the ones that are responsible for

2         producing the compliance guide, correct.

3   Q.    And what do you mean, responsible for

4         producing?

5   A.    Drafting, updating, revising the compliance

6         guide.

7   Q.    Does Navient Portfolio Management Compliance

8         Guide, does NPM have a copy of that?

9   A.    Yes.

10  Q.    You have it within your company's records?

11  A.    Yes.

12  Q.    And where is it?

13  A.    On a shared drive.

14  Q.    And is that within one of the software

15        programs or just a shared drive for

16        employees?

17  A.    Just a shared drive for employees.

18  Q.    All right.  And so it's a -- it's something

19        for your employees to follow?

20  A.    It more so provides guidance, guidelines,

21        guidelines to the agencies to follow.

22  Q.    I see.  So it tells your employees what to

23        tell the agencies to do?

24  A.    Repeat your question, please.

25              MR. FISHWICK:  Go ahead.

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

76

```
 1          Mr. Henderson?
 2    A.    Can you please -- can you either read it back
 3          or repeat your question?
 4              THE COURT REPORTER:   "Is there anything
 5          in this Navient Portfolio Management
 6          Compliance Guide that would have affected how
 7          the agencies interacted with Mr. Henderson?"
 8    A.    Yeah.
 9    Q.    What are those?
10    A.    I can't -- I don't know the audit guide
11          compliance guide by heart.  Like I just told
12          you, if the federal regs allow a borrower to
13          be contacted five times a day, if the Navient
14          compliance guide says we can only contact you
15          three times a day, that would have affected
16          the way the agency communicated with the
17          borrower.
18    Q.    But you didn't look at those documents in
19          preparation for today's --
20    A.    I did not.
21    Q.    -- deposition?  Okay.  But it is one
22          document?
23    A.    It is one document.
24    Q.    Turn to page 7, please.
25    A.    All right.
```

84

 1            don't understand the question.

 2    Q.      In preparation for today, did you do an

 3            investigation into the question that's

 4            outlined in No. 14?

 5    A.      I don't really see a question in No. 14.

 6    Q.      Okay.  Does NPM contend that the collection

 7            efforts as relates to Mr. Henderson did not

 8            follow its usual practice?

 9            THE WITNESS:  Can you please -- can you

10            repeat that one back?

11            THE COURT REPORTER:  "Does NPM contend

12            that the collection efforts as relates to

13            Mr. Henderson did not follow its usual

14            practice?"

15    A.      I'm not contending -- NPM is not contending.

16    Q.      NPM is not, you said?  Is NPM saying it

17            followed its usual practice with

18            Mr. Henderson?

19    A.      As far as I'm aware, NPM followed its normal

20            practice, yes.

21    Q.      Did you do an investigation of that --

22    A.      No.

23    Q.      -- in preparation for today's deposition?

24    A.      No.

25    Q.      How does -- turn to No. 15.  How does -- when

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

88

```
 1        refunds?
 2            MS. SIMONETTI:   Lacks foundation.
 3            Go ahead and answer it if you can.
 4   A.   Navient Portfolio Management's role with
 5        regards to borrower's tax refunds is limited.
 6        The federal regulations dictate what taxes
 7        can be offset, and the government Department
 8        of Education sends a file to the guarantor,
 9        in this case Great Lakes, that says a
10        borrower's account has been certified or
11        decertified for federal or state offset.
12            When the guarantor informs us that an
13        account has been certified, that feeds to our
14        system.  It triggers that the account has
15        been certified for offset per the government,
16        and if indeed the borrower files taxes and
17        doesn't take the appropriate steps to become
18        decertified, their taxes will be intercepted
19        and sent to the guarantor and subsequently
20        then sent to us to update the system, and us,
21        we'll send it then to the agency to let them
22        know that the taxes were offset.
23   Q.   And so, in Mr. Henderson's case, did the
24        guarantor notify NPM?
25   A.   I didn't look into whether the account was
```

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

89

1          ever certified.

2    Q.    So, in preparation for today, you did not

3          look into whether Mr. Henderson's account was

4          certified for an administrative set-off for

5          taxes?

6    A.    I did not.

7    Q.    If that had been done, what part of the

8          software programs are involved in that?

9    A.    The guarantor would be notified first.  They

10         would send a feed, a status update.  I don't

11         know the exact status.  But that status would

12         then indicate on Eagle that the account has

13         been certified.  And if a payment came in, it

14         would be marked as IRS as to an IRS payment.

15   Q.    All right.

16   A.    Which is directly from the government as

17         well.

18   Q.    All right.  And so that documentation, if

19         existed for Mr. Henderson, would be in Eagle?

20   A.    Yes.

21   Q.    But, again, you didn't look at that in

22         preparation for today?

23   A.    No, sir.

24   Q.    Why was Mr. Henderson's account removed from

25         GRC and placed with Pioneer?

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

90

1   A.   I didn't investigate as to why the account

2        was recalled and placed to Pioneer, so my

3        response would be purely speculative.

4   Q.   Okay.  And if you had done that work before

5        this deposition, where would you have gone?

6   A.   On the Eagle system.

7   Q.   Since June 22 of 2016, who were the

8        subordinate servicers NPM has contracted

9        with?

10  A.   Like, I couldn't name them off the top of my

11       head.

12  Q.   So, again, in preparation for today, you did

13       not do any investigation into Question No. 18

14       on the deposition notice?

15  A.   No, I did not.

16  Q.   Besides Eagle, what other shared

17       software/information systems exist between

18       NPM and its agencies?

19  A.   Specific to the FFELP business, the federally

20       funded student loans?

21  Q.   Yeah.

22  A.   Eagle is the only system that we use.  I

23       mean, we talked about storage of

24       documentations earlier that's on an ECS, but

25       that's not with third-party vendors.  So the

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

96

```
 1          and the board.
 2   Q.     And who's on the board?
 3   A.     I have no idea.
 4   Q.     Did you investigate that in preparation for
 5          today's deposition?
 6   A.     I did not.
 7   Q.     Besides Mr. Remondi as president, did you
 8          investigate who the officers were of -- other
 9          officers were of Navient Corp.?
10   A.     No.
11   Q.     And did you investigate who any of the board
12          of directors were of November Corp.?
13   A.     No.
14   Q.     And did you do that investigation from -- for
15          June of 2016 to the present?
16   A.     I did no investigation.
17   Q.     All right.  What is the state of
18          incorporation of NPM?
19   A.     Can you repeat that, please.
20   Q.     Yeah.  What state is NPM incorporated in?
21             MS. SIMONETTI:  It's an LLC.  We talked
22          about this earlier.
23   A.     Yeah.
24   Q.     All right.  What state is it incorporated in
25          or what state is it -- is it registered in?
```

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

97

```
 1          MS. SIMONETTI:  For what purpose?  That's
 2      vague.
 3  FURTHER QUESTIONS BY MR. FISHWICK:
 4  Q.   What state is it incorporated in?
 5  A.   Honestly, I don't know.
 6  Q.   Did you do any investigation into that in
 7      preparation for today?
 8  A.   I did not.
 9  Q.   What state is Navient Corporation
10      incorporated in?
11  A.   I didn't investigate that either.
12  Q.   All right.  How, then, is a -- how is an LLC
13      a subsidiary of -- how is Navient, NPM, a
14      subsidiary of Navient Corp.?
15  A.   I would say it's an affiliate of Navient
16      Corp.
17  Q.   And what does that mean?
18  A.   It's one of the companies underneath the
19      Navient Corp. umbrella.  There are -- Navient
20      Solutions, LLC is the servicing arm
21      underneath Navient Corp.  Portfolio
22      Management, LLC is an affiliate underneath
23      the umbrella of Navient Corp., the holding
24      company.
25  Q.   What are other affiliates?
```

101

1          mean?

2    A.    Yeah.  When borrowers need assistance with

3          their account, pre-default, delinquency, if

4          they need a forbearance, a deferment, there's

5          call centers available.  There's help

6          available.  That's what those people do.

7          They provide direction to these borrowers to

8          keep them in repayment, answer their

9          questions, and service their loans, like

10         anybody that has a mortgage or a car loan it

11         has questions on to try to prevent them from

12         defaulting and keeping them in repayment.

13   Q.    Take a look at Question 21 in the Notice of

14         Deposition.

15   A.    All right.

16   Q.    In preparation for today, did you identify

17         what accounts those were?

18   A.    No.

19   Q.    So you don't know what those accounts are?

20   A.    I do not.

21   Q.    So you can't answer the question for 21

22         because you don't even know which accounts

23         those are?

24   A.    That is correct.

25              MS. SIMONETTI:  Lacks foundation, too.

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

102

1          MR. FISHWICK:  Pardon?

2          MS. SIMONETTI:  Lacks foundation.

3    FURTHER QUESTIONS BY MR. FISHWICK:

4    Q.    And since you don't know what accounts these

5          are, you cannot provide an answer today of

6          who assigned or created these accounts?

7          MS. SIMONETTI:  Lacks foundation.

8          Go ahead.

9    A.    I cannot, no.

10         (Whereupon Exhibit No. 12 is marked for

11         identification.)

12   FURTHER QUESTIONS BY MR. FISHWICK:

13   Q.    I show you what's been marked as Exhibit 12,

14         and I'll ask you if you've seen that before.

15   A.    Again, I think this is the same document we

16         may have reviewed earlier today.  I may have

17         seen it yesterday, but I don't know if I --

18         you know, that's where I'm at.  I've seen a

19         lot of documents today.

20   Q.    Did other residents of Virginia receive this

21         same document?

22         MS. SIMONETTI:  You mean the same form of

23         document?

24         MR. FISHWICK:  Yes.  I agree with that

25         objection.

1  to it since this was sent to Mr. Henderson?

2  A.  There's been changes to this letter since

3  November 25 of '16, that is correct.

4  Q.  All right.  In preparation for today, have

5  you identified the identities and numbers of

6  individuals in Virginia who received Exhibit

7  14 from June 22, 2016, to the present?

8  A.  There was a request that, I believe, came

9  from Matt to identify that population.  I

10  engaged our IT department to, lack of a

11  better, I guess, scan the Eagle system for

12  letters that were sent to borrowers in the

13  State of Virginia.

14  Q.  And do you have the names of those people?

15  A.  The names could be produced.  I know there

16  was a count produced, but I'm sure the names

17  could be attached to those, yes.

18  Q.  And do you have those names today?  Have you

19  brought those names with you today?

20  A.  I have not brought those names with me today.

21  Q.  Did you do any research on those names prior

22  to today?

23  A.  I did not.

24  Q.  Have you reviewed any of the interrogatory

25  answers in this case that identify the

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

156

1          three different numbers on there.

2   Q.     All right.  And then the entry below that, it

3          says, "12/27/16 invoice."  What does that

4          mean?

5   A.     "12/27/16 DZ-DE invoice."  I don't know what

6          that code means.  I don't.

7   Q.     All right.  You didn't look at that ahead of

8          time?

9   A.     I did not look at that ahead of time, and,

10         quite frankly, I look at very few transaction

11         level detail histories.

12  Q.     Okay.  And you didn't look at that in

13         preparation for today?

14  A.     No, I did not.

15             (Whereupon Exhibit No. 19 is marked for

16         identification.)

17  FURTHER QUESTIONS BY MR. FISHWICK:

18  Q.     I show you what's been marked as Exhibit 19

19         and ask you to identify that.

20  A.     These are what appear to be collection notes

21         from General Revenue Corporation.

22  Q.     And do you know how they came into NPM's

23         possession?

24  A.     They would have had to have been requested

25         from NPM.

158

```
 1        identification.)
 2   FURTHER QUESTIONS BY MR. FISHWICK:
 3   Q.   I show you what's been marked as Exhibit 21.
 4        What is that document?
 5   A.   They appear to be collection notes from one
 6        of our vendors, but it doesn't specify the
 7        vendor or collection agency.
 8   Q.   So you don't know who gave this to you?
 9   A.   No, I do not.  I assume that it was either
10        General Revenue or Pioneer, and being that
11        we've already looked at the collection notes
12        from General Revenue, I assume this is the
13        collection notes from Pioneer Credit
14        Recovery.
15   Q.   But you didn't investigate ahead of time to
16        confirm that before this deposition?
17   A.   No.  There's two agencies that we're talking
18        about, so I assume it's Pioneer, but I did
19        not confirm it, no.
20            (Whereupon Exhibit No. 22 is marked for
21        identification.)
22   FURTHER QUESTIONS BY MR. FISHWICK:
23   Q.   I show you what's been marked as Exhibit 22
24        and ask you to identify that.
25   A.   It appears it's a Navient policy for
```

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

160

```
 1         policies.  It could be bonus plans and
 2         anything related to the policies with running
 3         the business.
 4   Q.    Is there an index of what all those policies
 5         are?
 6   A.    I'm sure there is.
 7              (Whereupon Exhibit No. 23 is marked for
 8         identification.)
 9   FURTHER QUESTIONS BY MR. FISHWICK:
10   Q.    I show you what's been marked as Exhibit 23
11         and ask you to identify that.
12   A.    It's another policy, and this policy specific
13         is the standard operating procedure related
14         to payment processing.
15   Q.    And is that how you described earlier when
16         money comes in?  What is this in reference
17         to?
18   A.    In no way, shape, or form is this policy
19         related to Navient Portfolio Management.
20         This is more related to what Navient
21         Solutions, LLC does in relation to servicing
22         borrowers pre-default.
23   Q.    Okay.  And that's what that policy is?
24   A.    That, to the best of my knowledge, that's
25         what that policy would be for.  It has
```

**Mark Verbrugge - 30(b)(6) - July 19, 2019**
**Henderson v. General Revenue Corporation, et al.**

161

1       nothing to do with NPM.

2   Q.   Okay.  But did you look at that ahead of

3       time?

4   A.   No.  No reason to.

5            MR. FISHWICK:  That's all the questions I

6       have.

7            THE WITNESS:  All right.

8

9            (The proceedings are concluded at

10      2:43 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25